UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VECTOR ELECTRIC & CONTROLS, INC.,
        Plaintiff,

            CIVIL ACTION

            No. 3:15-00252-JWD-RLB

VERSUS

ABM INDUSTRIES INCORPORATED, and TEGG INCORPORATED,
        Defendants.

## ORDER ON DEFENDANT ABM INDUSTRIES INCORPORATED'S MOTION TO COMPEL ARBITRATION AND TO DISMISS THE COMPLAINT OR, IN THE ALTERNATIVE, TO STAY PENDING ARBITRATION

**I. INTRODUCTION**

Before the Court is Defendant ABM Industries Incorporated's Motion to Compel Arbitration and to Dismiss the Complaint or, in the Alternative, to Stay Pending Arbitration ("Motion to Compel"), (Doc. 3), filed by one defendant, TEGG Inc. ("TEGG"), and both the second defendant and TEGG's apparent owner, ABM Industries, Inc. ("ABM") (collectively, "Defendants"). In opposition, Vector Electric & Controls, Inc. ("Vector," "Vector Electric," or "Plaintiff"), has submitted the Memorandum in Opposition to Motion to Compel Arbitration and to Dismiss the Complaint or, in the Alternative, to Stay Proceedings Pending Arbitration ("Opposition"). (Doc. 7.) Defendants have countered the Opposition with the Reply in Support of Defendant ABM Industries Incorporated's Motion to Compel Arbitration and to Dismiss the

Complaint or, in the Alternative, to Stay Pending Arbitration ("Reply"). (Doc. 8.) Having considered the arguments advanced by Defendants and Plaintiff (collectively, "Parties"), this Court finds that the Plaintiff's claims, as articulated in the relevant petition ("Petition") prior to its removal from the District Court of the Twenty-Third Judicial Circuit in and for Ascension Parish, Louisiana ("State Court"), (Doc. 1-1), to be subject to the most recent iteration of the freely and knowingly signed agreements to arbitrate "any dispute arising out of or relating to" the franchise agreement between Plaintiff and TEGG "or a claimed breach thereof" ("Arbitration Provision"),[1] (Doc. 3-2 at 10–65). Accordingly, pursuant to the Federal Rules of Civil Procedure[2] and Section 3 of the Federal Arbitration Act ("FAA"),[3] so as to allow for arbitration to commence and conclude, this Court will stay the present action.[4]

## II.   BACKGROUND

### A.   FACTUAL BACKGROUND

Founded as a California corporation in 1909, ABM incorporated in Delaware on March 19, 1985, and adopted its current name in 1994. ABM INDUSTRIES, INC., ANNUAL REPORT (Form 10-K) (Dec. 17, 2015); *see also* Doc. 1-1 at 1. It describes itself as "a leading provider of end-to-end integrated facility solutions to thousands of commercial, industrial, institutional, retail,

---

[1] There are, in fact, three separate arbitration provisions, as three different agreements were signed by TEGG and Plaintiff: the original franchise agreement, (Doc. 3-2 at 12–31); a first renewal, (*Id.* at 32–48); and a second renewal, (*Id.* at 49–65). While the section containing the agreement's arbitration language expanded from two to four paragraphs in these years, the Arbitration Provision did not substantively change. (*Compare id.* at 26, *with id.* at 47, 64.)

[2] In this opinion, any and all reference to "Rule []" or "Rules []" is to the Federal Rules of Civil Procedure unless otherwise noted.

[3] In this opinion, unless stated otherwise, any reference to "Section []" or "§ []" are to a part of the FAA.

[4] The enforcement of any resulting award will be governed by another section, 9 U.S.C. § 10(a); *cf. Downer v. Siegel*, 489 F.3d 623, 627 (5th Cir. 2007).

residential, and governmental facilities located primarily throughout the United States," with "comprehensive capabilities [that] include expansive facility solutions, energy solutions, commercial cleaning, maintenance and repair, HVAC, electrical, landscaping, parking, security, and commercial aviation support services, which we provide through stand-alone or integrated solutions." ABM INDUSTRIES, INC., QUARTERLY REPORT (Form 10-Q) (Sept. 3, 2015). More recently born, TEGG emerged in 1992 as a Delaware entity, its base in Pittsburgh, Pennsylvania. (Doc. 3-2 at 12, 34, 51; *see also, e.g.*, Doc. 1 at 2; Doc. 1-1 at 1.) As presently constituted, it holds itself out to be "an exclusive, international group of electrical contractors who are dedicated to providing the highest-quality service possible." TEGG, http://www.tegg.com/about%20us/pages/default.aspx (last visited on Jan. 5, 2016). Headquartered in New York, one of ABM's many operating units, ABM Franchising Group, acquired TEGG's assets in 2012.[5] (Doc. 1-1 at 7–8; *see also* Doc. 3-1 at 3.) Apparently, TEGG thereupon became "defunct." (Doc. 1 at 2; *see also* Doc. 1-1 at 7–8.) Amongst the assets purchased was TEGG's franchise agreement with Plaintiff, a Louisiana corporation. (Doc. 1-1 at 1, 7–8.)  The product of negotiations between TEGG and Plaintiff that first began in 1995, this accord was signed on June 1, 1997, and renewed on June 1 of 2003 and 2009. (Doc. 3-2 at 27, 47, 65; *see also, e.g.*, Doc. 3-1 at 2–3; Doc. 7 at 1–2.) Pursuant to these agreements' terms, Vector served as "an electrical and instrumentation contractor providing services to clients primarily in South Louisiana and Texas," operating as a member of TEGG's and later ABM's franchise network of electrical contractors. (Doc. 1-1 at 1; *see also* Doc. 7 at 1–2.) In 2013, as required by the franchise agreement's latest renewal, Vector paid $97,950 to ABM. (Doc. 1 at 2;

---

[5] In fact, at present, TEGG is one of this unit's three franchise brands. ABM FRANCHISING GROUP, http://www.abm.com/pages/franchising-group.aspx (last visited on Jan. 5, 2016).

*see also* Doc. 1-1 at 8.)

The Arbitration Provision appears in Section 41 of the franchise agreement's second renewal ("Section 41"). (Doc. 3-2 at 64; *see also* Doc. 3-1 at 3–4.) Having taken effect "upon its acceptance and execution by TEGG," Section 41's first paragraph declares: "Except to the extent governed by the Federal Arbitration Act, this Agreement shall be interpreted and construed in accordance with the laws of the Commonwealth of Pennsylvania, which laws shall prevail in the event of any conflict of law." (Doc. 3-2 at 64; *see also* Doc. 3-1 at 4.) The second paragraph reads: "Except as provided below, the parties agree that, should any dispute arise between them under, relating to or in connection with this Agreement, prior to the commencement of an arbitration or other proceeding pursuant to this Agreement, they shall designate one or more representatives with authority to resolve face-to-face . . . in a good-faith effort to amicably resolve the dispute." (Doc. 3-2 at 64; *see also* Doc. 3-1 at 5.) If these first efforts proved unsuccessful, the Parties bound themselves to continue discussions "under the then-prevailing commercial mediation rules of a recognized dispute resolution service . . . ." (Doc. 3-2 at 64; *see also* Doc. 3-1 at 5.) The failure of this second mediation triggered the agreement's Arbitration Provision: "[A]ny dispute arising out of or relating to this Agreement, or a claimed breach thereof, that remains unresolved after discussions and mediation shall be submitted to arbitration by the American Arbitration Association in accordance with its Commercial Arbitration Rules." (Doc. 3-2 at 64; *see also* Doc. 3-1 at 4.) This identical sentence appeared in the original franchise agreement and its first renewal (Doc. 3-2 at 26, 47.) Section 41's fourth paragraph contains an inapposite example concerning TEGG's alleged intellectual property. (*Id.* at 64.)

Beginning in January 2014, Vector allegedly fell behind on the payments owed to ABM. (Doc. 3-1 at 4.) By August 2014, the debt ballooned to $81,246. (*Id.*) ABM notified Vector of

this failing by letter dated September 2, 2014. (*Id.*) When Vector did not respond, ABM invoked the dispute resolution mechanism set forth in Section 41. (*Id.*; *see also* Doc. 3-2 at 64.)

**B.    PROCEDURAL BACKGROUND**

In response, Plaintiff filed the Petition on March 18, 2015. (Doc. 3-1 at 4–5; Doc. 1-1 at 5.) With the Petition, Vector indirectly[6] sued ABM for breach of the franchise agreement. (*Id.* at 3.) In particular, it argued that Vector "relied upon the statement, representations, and assurances of the employees, agents, and/or representatives of ABM and/or TEGG to the detriment of Vector . . . which sustained damages as a result thereof" and attacked any such statements as "misrepresentation[s] or suppression[s] of the truth made with the intention of inducing Vector . . . to enter into a contractual relationship with and pee fees to ABM." (Doc. 1-1 at 4; *see also* Doc. 3-1 at 3–4.) In addition, Vector contended that ABM's "actions and/or inactions . . . constitute a violation of the Louisiana Unfair Trade Practices Act." (Doc. 1-1 at 4.) Damages allowable under this state statute, as well as "additional damages, attorneys' fees, and exemplary damages," are sought. (*Id.*) Though left unquantified, in a later letter to ABM, Plaintiff's counsel allegedly stated that Vector "will present multiple claims which, if successful, will be several hundred thousand dollars, and potentially could reach into the seven figure range."[7] (Doc. 1 at 3.)

Defendants removed the Petition from State Court on April 22, 2015, (*Id.*), an action that Plaintiff has never opposed. On July 9, 2015, Defendants filed the Motion to Compel. (Doc. 3.) The Opposition followed on July 30, 2015. (Doc. 7.) The Reply came on August 13, 2015. (Doc.

---

[6] Even though ABM does not do business as ABM Franchising Group, Plaintiff served the complaint on the latter and the seemingly nonexistent TEGG. (Doc. 1-1 at 1, 7.) As such, the one true defending party is ABM, which received the Petition via ABM Franchising Group.

[7] The Notice of Removal references this letter and directs this Court to Exhibit E. (Doc. 1 at 3.) No document labeled "Exhibit E," however, was attached to this first filing. This mishap occurred again with "Exhibit 3" to the Motion to Compel. (Doc. 3-1 at 4.) While neither oversight is dispositive, both are troubling.

8.) After various scheduling and status conferences were continued, (Docs. 11, 13, 18, 20), a hearing on the Parties' contentions was scheduled for January 14, 2016, at 3:00 p.m., on December 14, 2015. (Doc. 21.) In this flurry's midst, on June 18, 2015, Defendants filed a demand for arbitration with the American Arbitration Association. (Doc. 3-1 at 5.) In accordance with this Court's earlier order, oral argument on the Motion to Compel took place on January 14, 2016.

### C.   PARTIES' ARGUMENTS

Resting on the "strong federal policy favoring resolution of disputes by arbitration" embodied in the FAA and emphasizing the breadth of the "express" Arbitration Provision, Defendants insist that this Court "must compel Vector to arbitrate its claims and either dismiss this action or stay this action pending completion of the arbitration." (*Id.* at 1, 5, 6.) Only two considerations are involved in the determination of whether two parties agreed to arbitrate a dispute—whether a valid agreement exists, and whether the relevant dispute falls within the agreement's scope—and both elements here favor arbitration. (*Id.* at 7–11.) In this vein, Defendants emphasize that the Arbitration Provision is "[v]alid and [e]nforceable," Vector's claim are wholly "[a]rbitrable," and "[n]o [f]ederal [s]tatute or [p]olicy . . . [r]enders Vector's [c]laims [n]onarbitrable." (*Id.*)

Plaintiff, in turn, argues otherwise, advancing two arguments. First, according to Plaintiff, this Court must alone decide whether "a valid and binding contract" exists. (Doc. 7 at 5.) Such a determination necessarily includes analysis of whether any consent given was "vitiated by misrepresentation or error, fraud, or duress." (*Id.* at 6.) Notably, Plaintiff specifies that its allegations in this regard relate to the entire contract rather than the Arbitration Provision

specifically: "Where, as here, you have allegations that there was fraudulent inducement to enter into *a contract* which contains *a clause* mandating that all disputed [sic] be resolved through private arbitration as opposed to through the courts . . . ." (*Id.* at 6 (emphasis added); *see also* Doc. 8 at 3.) Equally significantly, after conceding that the Supreme Court in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.* ("*Prima Paint*"), 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967), has ruled differently, Plaintiff cites the dissent in this seminal case as support for the proposition that "the validity of a contract containing an agreement to arbitrate . . . [should] be a threshold issue to be decided by the [c]ourts." (*Id.* at 6–8.) Continuing, Plaintiff attempts to document the perceived "flaw[s] in the majority opinion," engaging in its own exercise of statutory interpretation. (Doc. 7 at 6–7.) Indeed, though it cites no case or commentary, Plaintiff correctly notes that much criticism has been leveled against *Prima Paint*. (*Id.* at 9.) Second, Plaintiff contests ABM's "standing and/or right to enforce arbitration when it was not a party to the [sic] any of the agreements to which the arbitration agreement was included." (*Id.* at 9–10.) To its eyes, "[a]s is clear from the memorandum and the exhibits attached to the memorandum, the part[y] with whom Vector . . . contracted was TEGG Incorporated and not ABM." (*Id.* at 10.) Certainly, Plaintiff insists, "ABM has not attached any of the agreements related to . . . [its] purchase [of TEGG] nor have those documents been provided to counsel for Vector . . . ." (*Id.*) Seemingly, moreover, ABM's claim "conflicts with statements made by counsel for ABM that it was actually ABM Industries Incorporated which purchased the assets of TEGG Corp. and then in some type of transaction the franchise agreement with Vector was assigned to ABM Franchising Group, LLC, a wholly owned subsidiary." (*Id.*) With these facts apparently unknown, discovery is necessary, so that Plaintiff could "make and [sic] additional arguments as to whether ABM indeed cannot enforce an arbitration clause in an agreement to which it was

never a signatory." (*Id.* at 11.)

In the Reply, Defendants make three points. First, stressing the Arbitration Provision's explicit breadth, Defendants emphasize that numerous decisions support its position, including *Prima Paint Prima Paint* and its ever-expanding progeny. (Doc. 8 at 2–3.) Second, Defendants point out that Plaintiff's allegations of fraud concern the entire contract, not the Arbitration Provision alone, and the overwhelming majority of cases classify such fraud allegations as the arbitrator's province. (*Id.* at 3.) Finally, as to the standing issue raised by Plaintiff, Defendants direct this Court's attention to the declaration of Mr. Martin Keyser, ABM Franchising Group's Vice-President, who explains the exact relationship between ABM and TEGG, (Doc. 1-1 at 7–8), and to the Petition itself, which alleges that ABM is a party to the current franchise agreement, (*Id.* at 1). (Doc. 8 at 4.) Relatedly, Defendants stress that, under Pennsylvania and Louisiana law, "a nonsignatory can enforce an agreement to arbitrate where the claims against the nonsignatory are related to arbitrable claims." (*Id.* at 4–5.)

### III.   DISCUSSION

### A.   APPLICABLE LAW

Since 1925, Chapter 1 of the FAA has changed little. Christopher R. Drahozal, *In Defense of Southland: Reexamining the Legislative History of the Federal Arbitration Act*, 78 NOTRE DAME L. REV. 101, 123 (2003).   Section 1 defines the key terms "maritime transactions" and "commerce" and excludes certain employment contracts from the FAA's scope. 9 U.S.C. § 1; *Circuit City Stores, Inc. v. Saint Clair Adams*, 532 U.S. 105, 109, 121 S. Ct. 1302, 1306, 149 L. Ed. 2d 234 (2001). Section 2 provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. As written, therefore, Section 2 covers interstate and foreign commerce. *Id.* In a line trumpeted by the Supreme Court in later decades, the Committee on the Judiciary of the House of Representatives described Chapter 1 as "founded *also* upon the Federal control over interstate commerce and over admiralty," the previous sentence, containing another basis of jurisdiction, declaring the law to be directed at "the courts of the United States." H.R. REP. NO. 96-68 at 1 (emphasis added). The fundamental purpose of the FAA was and remains to override American courts' traditional refusal to enforce privately negotiated arbitration agreements. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478, 109 S. Ct. 1248, 1255, 103 L. Ed. 2d 488 (1989) (collecting cases, including *Prima Paint*); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S. Ct. 1740, 1745, 179 L. Ed. 2d 742 (2011) ("The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements."). So motivated, "[b]ased upon and confined to the incontestable federal foundations of control over interstate commerce and over admiralty," the FAA had established the substantive law applicable in diversity cases. *Prima Paint*, 388 U.S. at 405 (internal quotation marks omitted); *see also, e.g.*, *Jensen v. Fisher Commc'ns, Inc.*, No. 3:14-cv-00137-AC, 2014 U.S. Dist. LEXIS 167331, at *8, 2014 WL 6851952, at *3 (D. Or. Dec. 3, 2014) (quoting

*id.*).

Generally, "precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299, 130 S. Ct. 2847, 2857–58, 177 L. Ed. 2d 567 (2010) (emphasis added) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923, 131 L. Ed. 2d 985 (1995)). In *Prima Paint*, the Court labeled the final sequence of Section 2 of the FAA's first chapter—"save upon such grounds as exist at law or in equity for the revocation of any contract"— the Saving Clause. *Prima Paint*, 388 U.S. at 404 n.12. Heeding the Court's words, lower courts categorically describe it as the "primary substantive provision of the Act," the second of only two limitations on the enforceability of an arbitration provision governed by Chapter 1. *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1982). Per this clause, as the Court noted in *Perry v. Thomas*, "state law, whether of legislative or judicial origin, [remains] . . . applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902 (1995) (emphasis in original); *accord, e.g.*, *AT&T Mobility LLC*, 563 U.S. at 339; *Arthur Anderson, L.L.P., et al. v. Wayne Carlisle*, 556 U.S. 624, 630–31, 129 S. Ct. 1896, 1902, 173 L. Ed. 2d 832 (2009); *First Options*, 514 U.S. at 944. Hence, state doctrines, at law or in equity, that govern validity, revocability, and enforceability of contracts can invalidate an arbitration clause, regardless of the parties' intent. Furthermore, per the doctrine of severability, derived from Section 4 as

interpreted in *Prima Paint*, such objections, including fraud, duress, and unconscionability, must specifically relate to the arbitration clause of a general contract. If no taint attaches to the clause itself, a court must still compel arbitration, with the arbitrator thereafter weighing the binding force of the overall contract. *See, e.g.*, *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2778 (2010) (citing *Preston v. Ferrer*, 552 U.S. 346, 353–54, 128 S. Ct. 978, 983–84, 169 L. Ed. 2d 917 (2008); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006); *Prima Paint*, 388 U.S. at 403–4). Although this construction of the FAA has been subject to much criticism,[8] it remains, inescapably and indisputably, the binding mandate of this nation's highest court.[9]

In sum, so long as (1) a valid agreement to arbitrate is tendered, (2) the relevant dispute falls within that agreement's ambit, and (3) none of the general contract defenses subsumed into the Savings Clause have been presented, arbitration must follow, and a federal case either stayed or dismissed. *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 396 & n.8 (5th Cir. 2006); 9 U.S.C. §§ 3–4.

**B.   APPLICATION**

Guided by this well-established body of law, this Court sees no other option than to order arbitration for two reasons.

First, the Arbitration Provision here is not uncommonly broad, its reach easy to discern.

---

[8] The literature as to this issue is almost comically voluminous. *See, e.g.*, Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created a Federal Arbitration Law Never Enacted by Congress*, 44 FLA. ST. L. REV. 99 (2003); Larry J. Pittman, *The Federal Arbitration Act: The Supreme Court's Erroneous Statutory Interpretation, Stare Decisis, and a Proposal for Change*, 53 ALA. L. REV. 789, 889–90 (2002); Jean R. Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration*, 74 WASH U. L. Q. 637, 666 (1996).

[9] In fact, "[h]owever much a district court may disagree with an appellate court, a district court is not free to disregard the mandate or directly applicable holding of the appellate court." *Whole Woman's Health v. Cole*, 790 F.3d 563, 581 (5th Cir. 2015) (citing *United States v. Teel*, 691 F.3d 578, 582-83 (5th Cir. 2012)).

Quite simply, it contains language—"any dispute arising out of or relating to the Agreement, or a claimed breach thereof," (Doc. 3-2 at 64)—that numerous courts have found sufficiently broad to induce arbitration of any disagreement over any rights and violations reasonably traceable to the pertinent contract. *See, e.g.*, *BP Am. Prod. v. Chesapeake Exploration LLC*, 747 F.3d 1253, 1256 (10th Cir. 2014) (describing such a phrase as "a catch-all provision"); *Ariza v. Autonation, Inc.*, 317 F. App'x 662, 664 (9th Cir. 2009) (finding this language to be clear and unmistakable); Joseph T. McLaughlin, *Arbitrability: Current Trends in the United States*, 59 ALB. L. REV. 905, 932 (1996) (contending that such "broad, general language" usually renders any "tort claim . . . arbitrable if the claim is either directly or indirectly related to the subject matter of the contract"). The geneses and gravamen of Plaintiff's suit are Defendants' alleged breaches of three contracts, each of which includes an identically worded Arbitration Provision, and TEGG's purported improprieties in inducing Plaintiff to consent to the contract *in toto*. (Doc. 1-1 at 1–7.) Based on these patent facts, even if the Petition is construed in a light most generous to Plaintiff, its stated legal causes of action cannot but be described as a "dispute arising out of the" franchise agreement or its supposed "breach," a kind of dispute that falls squarely and comfortably within the Arbitration Provision's plain ambit. *See, e.g.*, *Hamel-Schwulst v. Country Place Mortg., Ltd.*, 406 F. App'x 906, 913 (5th Cir. 2010) (holding that "arbitration provisions containing the language 'related to' are broad clauses that are not limited to claims that literally arise under the contract, but rather embrace all disputes having a significant relationship to the contract regardless of the label attached to the dispute" (internal quotation marks omitted) (citing *Pennzoil Exploration & Prod. Co. v. Ramco Energy*, 139 F.3d 1061, 1067 (5th Cir. 1998))); *Allen v. Regions Bank*, 389 F. App'x 441, 445 (5th Cir. 2010) (noting that "if the contract as a whole . . . is contested, the court may still require arbitration of that dispute because the

arbitration provision itself is not challenged"); *Telecom Italia, SPA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) ("[W]here the dispute occurs as a fairly direct result of the performance [or nonperformance] of contractual duties . . . , then the dispute can fairly be said to arise out of or relate to the contract in question, and arbitration is required."); *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 385 (11th Cir. 1996) ("[A] claim of fraud that related to inducement of an agreement generally is covered by an arising out of or relating to this agreement arbitration clause." (citing *Prima Paint*, 388 U.S. at 395))); *cf. OMG, L.P. v. Heritage Auctions, Inc.*, 612 F. App'x 207, 212 (5th Cir. 2015) ("Courts, including our own, have refused to allow such maneuvering where parties initially submitted their grievances in writing to an arbitrator."). In the face of this overwhelming precedent and the Arbitration Provision's explicit terms, Plaintiff has directed this Court to a dissent, however compelling, *see supra* note 9, whose reasoning has never been endorsed by a majority of the Supreme Court. (Doc. 7.) Yet, as a matter of incontestable juridical fact, the Supreme Court has steadfastly adhered to its broad construction of the FAA, however ill-founded it may appear to Plaintiff here, in spite of the repeated pleas of scholars and litigants. *See, e.g.*, *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 503, 184 L. Ed. 2d 328 (2012); *AT&T*, 563 U.S. at 345–46. Per this law, a valid and capacious agreement to arbitrate appears in the second renewal's forty-first section. *See, e.g.*, *ITT Educ. Servs. v. Arce*, 533 F.3d 342, 345–46 (5th Cir. 2008); *Pleasant v. Houston Works USA*, 236 F. App'x 89, 92 (5th Cir. 2007); *cf. United States v. Ihsan Elashyi*, 554 F.3d 480, 501 (5th Cir. 2008) (noting that, in the arbitration context, the Supreme Court has "given the phrase 'arising out of' a very broad interpretation"). Indeed, wherever a "contract contains an arbitration clause, there is a presumption of arbitrability." *Tittle v. Enron Corp.*, 463 F.3d 410, 418 (5th Cir. 2007) (relying on *Preston v. Ferrer*, 552 U.S. 346, 349, 128 S. Ct. 978, 981, 169 L. Ed. 2d 917 (2008)). Broadly

written and buttressed by this presumption, the Arbitration Provision must be enforced as a matter of supreme federal statutory law.[10] *See, e.g.*, Griswold v. Coventry First LLC, 762 F.3d 264, 271 (3d Cir. 2014).

Furthermore, for two other reasons, this Court finds no merit in Plaintiff's standing argument, (Doc. 7 at 9–12).

As a threshold matter, per the Petition, Plaintiff has sued ABM, though under a different name. (Doc. 1-1 at 1.) For it to now contend that ABM is a non-party to the contract which forms the basis of its suit, thereby rendering it unable to enforce the Arbitration Provision, is both disingenuous and inconsistent. In fact, courts have long recognized five contract-based doctrines through which a non-signatory may still be bound by an arbitration agreement entered into by others, including estoppel. *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing *Fyrnetics (H.K.) Ltd. v/ Quantum Grp.*, 293 F.3d 1023, 1029 (7th Cir. 2002)). In explaining this doctrine's application to the arbitration context, the Fifth Circuit has observed that "[a] signatory plaintiff cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) (internal quotation marks omitted); *see also, e.g.*, *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 708 (10th Cir. 2011) (quoting *id.*); *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) ("[I]t is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." (internal quotation marks omitted)). In essence,

---

[10] It thus greatly matters that Plaintiff has never argued that the defenses encompassed by the Saving Clause apply to the Arbitration Provision or that it did not sign the original franchise agreement and its two renewals.

Plaintiff now attempts to achieve precisely what this doctrine forecloses.[11] It has portrayed ABM as an effective signatory in its prior filings; this Court now holds it accountable for its own assertions.

Perhaps more significantly, Pennsylvania law, applicable per Section 41, (Doc. 3-2 at 26, 47, 64), is clear. As Defendant rightly contends, (Doc. 8 at 4), "Pennsylvania law allow non-signatories to be bound to an arbitration agreement," *Griswold*, 762 F.3d at 271. In a string of cases, Pennsylvania's courts have said so expressly. *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006) (holding that non-signatories to a contract may be compelled to arbitrate when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties"); *accord, e.g.*, *Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1097 (Pa. Super. Ct. 2015) (citing *id.*); *Smay v. E.R. Stuebner, Inc.*, 864 A.2d 1266, 1273 (Pa. Super. Ct. 2004) ("[A] non-party, such as a third party beneficiary, may fall within the scope of an arbitration agreement if that is the parties' intent."). To date, though it cites to Louisiana cases in its Opposition, (Doc. 7 at 5 & n.3, 6 & nn. 4–6), Plaintiff has contested neither the application of Pennsylvania law nor Defendants' interpretation of this foreign legal regime. Nor, in truth, could it do so in light of the unambiguous import of Section 41.[12] Accordingly, because ABM, as an apparent agent and successor of TEGG, can enforce the Arbitration Provision under Pennsylvania law, Plaintiff's attack upon its standing is insupportable.

---

[11] In fact, two other exceptions—agency and incorporation by reference—can be said to apply. As public records attest, ABM Franchising Group is a wholly owned subsidiary of ABM and runs TEGG's formerly independent operations. *See supra* Part II.A. As such, because its verifiable agent is a party to the contract, the non-signatory ABM can enforce it. In addition, as the contract does not foreclose its transfer by the franchisor, i.e. TEGG, it can said to incorporate any of its rightful successors. While Plaintiff seems to contest ABM's position as a legal successor, it has not raised a modicum of doubt regarding the evidence adduced in support of this conclusion by Defendants and available in the public arena.

[12] Instead, as shown above, Plaintiff makes a plea for further discovery, cites a Fifth Circuit case applying Texas law, and distinguishes a Louisiana court case. (Doc. 7 at 10–11.) Read as it is, however, Section 41 compels the application of Pennsylvania law.

## IV. CONCLUSION

The Arbitration Provision encompasses every claim raised in Plaintiff's Petition, binding both Defendants and Plaintiff with definite clarity. Thus, pursuant to the FAA, arbitration must be commanded. Consequently, this Court orders as follows:

(1) **Defendant ABM Industries Incorporated's Motion to Compel Arbitration and to Dismiss the Complaint or, in the Alternative, to Stay Pending Arbitration**, (Doc. 3), is **GRANTED**.

(2) However, rather than dismissal, the present action shall be **STAYED** pending the results of the Parties' arbitration.

**IT IS FURTHER ORDERED** that the hearing on all pending motions in this matter previously set for January 14, 2016, at 3:00 p.m. is canceled.

Signed in Baton Rouge, Louisiana, on <u>January 11, 2016</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**